## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| **SARA CLARK AND** | ) | |
| **SEAN GAGNON,** | ) | |
| | ) | |
| **PLAINTIFFS** | ) | |
| | ) | |
| **v.** | ) | **CIVIL NO. 04-184-P-H** |
| | ) | |
| **STEVEN WEBSTER,** | ) | |
| | ) | |
| **DEFENDANT** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This lawsuit for a violation of constitutional rights grew out of an afternoon confrontation between a Maine Drug Enforcement agent and a young woman in western Maine. The drug agent was convinced that he was about to obtain a search warrant from a state judge for marijuana-related evidence in the young woman's condominium unit. He therefore "secured" the unit. The young woman was resentful of the agent's and two Bridgton police officers' intrusion, offended that the agent concluded that her hard-earned waitressing tips were drug money, and fearful that he would seize her money. I find both their stories credible and consistent in many ways, although their differing perspectives color their interpretations of the events. On some important matters, however, they completely disagree. In ways that make a difference legally, I conclude that the events did not happen just as the young woman and her boyfriend (the other

condominium tenant) recall.[1]  As a result, I conclude that the defendant agent did not conduct an illegal search or seizure.  It is important to note, however, that ultimately there was no evidence that either the young woman or her boyfriend was involved in any criminal activity.

I presided at a bench trial on July 27-29, 2005.  After considering the evidence and the arguments, I make the following Findings of Fact and Conclusions of Law.

## I.  FINDINGS OF FACT

1.     On August 11, 2003, the plaintiff Sara Clark, then three years out of high school, brought almost $14,000 in cash to the Norway Savings Bank.  The teller for the transaction was Amy Perrault.

2.     Clark's currency consisted of a large number of one-dollar bills, 600 five-dollar bills, 600 ten-dollar bills, and 200 twenty-dollar bills.[2]

3.     Clark brought the money to the bank in plastic sandwich baggies.  Drugs are often packaged in such baggies.

4.     Clark did not deposit the money into her bank account but instead asked to exchange her cash for larger bills (mostly hundreds).  When Perrault

---

[1] I found her boyfriend/co-tenant/co-plaintiff Sean Gagnon to be less persuasive as a witness. The memories of the two Bridgton police officers King and Taft were not always reliable.  They were testifying to events that happened two years ago, with no police reports to refresh their memories.

proceeded to fill out a Currency Transaction Report (Joint Ex. 2) (a report required for transactions over $10,000), Clark asked her why she needed to do so.

5.      Perrault gave Clark $13,900 in hundred-dollar bills, plus a five-dollar bill and three one-dollar bills for a total of $13,908.  Clark left the bank, went home and put the money in a safe in the condominium unit she shared with her boyfriend, co-plaintiff Sean Gagnon.

6.      According to Perrault and other bank employees, the currency Clark exchanged smelled strongly of marijuana.  In fact, the odor was so strong that the branch manager was concerned that the odor would migrate to other currency in the vault and that when that currency was distributed to customers, the Bank's reputation would be tarnished.

7.      Laurie Griffin Polland, the teller supervisor, observed the transaction between Clark and Perrault and noticed pieces of a greenish-brown leaf-like substance in the baggies.  Perrault threw the baggies away after the transaction was complete.

8.      Perrault filled out a Suspicious Activity Report (Joint Ex. 6) after Clark left the bank.  Perrault wrote in this report that the money "had a distinct aroma of marijuana."  Joint Ex. 6 at 3.

---

2 Clark testified that she brought 1,278 one-dollar bills.  The currency transaction report, however, reveals that her total currency was $13,908. The discrepancy makes no difference to the case.

9.      The next day, August 12, a bank security officer called the Maine Drug Enforcement Agency ("MDEA").  The defendant, Steven Webster, then an MDEA agent, was assigned to investigate.

10.      Webster went to the bank around noontime on August 12, 2003.

11.      Bank personnel showed Webster the money Clark had exchanged, the baggies (retrieved from a trash dumpster), the Currency Transaction Report and the Suspicious Activity Report.   Perrault also provided him a written statement (Joint Ex. 5) describing the transaction and the marijuana odor. Webster watched a videotape of the transaction.  He noticed on the Currency Transaction Report that Clark was a waitress, and also noticed from subpoenaed bank records (Def. Ex. 27) that she had received checks from Friendly's restaurant.  Webster saw in Clark's subpoenaed bank records that she had less than $500 in her bank account.

12.      Bank employees gave Webster two pieces of a green, leafy substance that they said came out of at least one of Clark's baggies.  Webster, who has extensive drug training, thought the substance looked like marijuana.  These pieces were about half the size of a pencil eraser.  The bank employees told Webster that they had retrieved the baggies from the trash dumpster, where the baggies had been overnight.  Polland told Webster that she had seen more of that substance in the baggies before they were thrown away.  Webster conducted a

4

field test on the substance, but it did not test positive for marijuana.  He had never tried before to test such a small sample of marijuana.

13.     Webster smelled the money and the baggies and confirmed that both had a strong odor of marijuana.

14.     At this point, Webster had a suspicion that Clark was trafficking in marijuana, but believed that he did not yet have probable cause to search her residence and that a judge would refuse to issue a search warrant.  To further his investigation, he called the phone number Clark had provided the Bank, received no answer and left a voice message.  (The phone he called was actually that of the mother of co-plaintiff Sean Gagnon.)

15.     Webster enlisted assistance from local Bridgton police officers Douglas Taft and Bernie King and all three arrived at Clark's rented condominium around 3:15 pm.  Webster still did not believe that he had probable cause to obtain a warrant to search the condominium.

16.     Clark's condominium is a basement level unit.  Access to that and one other unit is through a common outside door at ground level.  The other unit's interior door is at this same level; Clark's unit is down a flight of stairs.

17.     When the law enforcement officers arrived, Taft proceeded around the outside to ensure that no one left the unit, while Webster and King rang the doorbell on the ground level outside door.

18.    Clark held two waitressing jobs, one at Friendly's Ice Cream and the other at the White Mountain Hotel.  She had injured herself at work that day at the White Mountain Hotel (receiving second degree burns on her arms from a coffee spill), had visited the hospital, then returned home early and slept on the couch.

19.    When the doorbell awoke her, Clark came to the outside door. Webster identified himself as a drug enforcement agent, and asked if she was Sara Clark (he recognized her from the bank's videotape), if she had exchanged approximately $13,900 at the Norway Savings Bank, and where she got all the currency she had exchanged.  Clark responded affirmatively to the first two questions and said that she had saved the money from tips from her two waitressing jobs.

20.    Webster asked Clark why the currency smelled like marijuana.  Clark responded that she did not know why the money smelled, and that "all money smells."[3]

21.    Clark told Webster outside the condominium that she still had the money she had received at the bank, and that it was in a safe in the condominium bedroom.[4]

---

[3] At trial, Clark offered, as an explanation for the money's smell, the fact that her basement unit had a moldy smell and that Webster should have noticed the odor once he got inside the condominium.  She did not testify that she offered Webster that explanation at the outside door.

6

22.     Webster asked permission to search the condominium; Clark refused.

23.     At this point, Webster believed that he had probable cause to search the condominium.

24.     Webster told Clark that he was securing the apartment and that she could stay outside or go inside with the officers while they waited for a search warrant.  Clark was upset, let the officers in, turned around to go downstairs to her unit, and the agent and both police officers followed.  Webster did not threaten to arrest Clark.[5]

25.     Webster followed Clark to the couch in the living room.  Officers Taft and King—but not Agent Webster—did a cursory sweep of the adjacent rooms for their protection.  It was so cursory that they did not see a loaded rifle on the floor next to the bed in the bedroom.

26.     Within ten minutes of first arriving at the condominium complex, Webster tried to call another agent, Sean Lally, to prepare the search warrant application in Portland.  Because he could not get a signal for his cell phone,[6] Webster went outside to the parking lot where he could make a connection.  His phone records confirm that his first call to Lally was at 3:22 p.m. The records

---

[4] Clark denies that she told Webster the safe was in the bedroom, but the warrant application contains that information (Joint Ex. 8 at 5) and there is no other source for it.

[5] In this respect I reject Clark's testimony and credit that of Webster, King and Taft.  Clark may have been confused inasmuch as she was not free to go back to her unit by herself once Webster secured it.  I find that there would be little reason for Webster to threaten her with arrest when he believed that he was going to obtain a search warrant.

confirm several phone calls thereafter with Lally and also with Assistant Attorney General Lea-Anne Sutton in preparation of the warrant application.  Webster understood from his phone calls with Assistant Attorney General Sutton that she agreed that he had probable cause to request a warrant.

27.     While Webster, accompanied by Officer King, was outside using his cell phone, Sean Gagnon arrived.  When Gagnon identified himself and said that he was going inside, Webster told him that he had to be accompanied by an officer for officer safety purposes.   King also told Gagnon that he had to be accompanied by someone at all times.  King then accompanied Gagnon inside.

28.     At some point (and perhaps more than once), Webster told Clark and Gagnon that they would be searched if they left the condominium unit and searched again if they then wanted to re-enter the unit.  I find that he did not prohibit them from leaving the condominium unit.[7]

29.     Gagnon asked Webster to leave the unit, but Webster refused, again stating that he had secured the unit pending the issuance of a search warrant.

---

[6] On one occasion, he used Clark's landline phone over her objection, in an effort to try to speed the warrant process.

[7] They both testified that they were prohibited from leaving. Webster, King and Taft all testified that there was no such prohibition. Clark and Gagnon could easily have been confused, given the conditions imposed as well as a statement made to them that it would be good for at least one to remain in the unit while the officers were there.

30.    Contrary to the testimony of Clark and Gagnon, I find that Webster did not tell Taft that if Gagnon and Clark wanted to use the bathroom, they would have to leave the door open and not flush the toilet.[8]

31.    Contrary to what Clark and Gagnon claim, I find that Webster did not tell them that the state judge had signed a search warrant.  Confusion on the process is understandable.  Because Webster was in Bridgton and the judge was in Portland, Webster needed to dictate the warrant application and the proposed warrant over the telephone to Agent Lally in Portland, get it completed, obtain approval of the documents from  Assistant Attorney General Sutton (also in Portland), and finally have the package hand-delivered to the state judge.  So there were various stages of progress toward the warrant's issuance,[9] reporting of

---

[8] I do not credit Gagnon's testimony on direct and Clark's testimony on redirect about Webster's involvement in restricting their use of the bathroom.  Not until redirect did Clark claim that Webster told Taft about the bathroom restrictions, and this testimony is inconsistent with her deposition testimony, in which she said only that Taft was involved.  It is also inconsistent with the computer notes (Def. Ex. 3) that Clark and Gagnon say they created soon after the incident.  Those notes refer only to Taft when describing the bathroom restriction.  Id. at 3.  The written complaints they filed against Webster in 2003 also do not mention the bathroom restriction.  Def. Exs. 13-15.  None of the officers remembers restricting Clark's and Gagnon's use of the bathroom.

[9] Webster arrived at the condominium around 3:15 p.m.  Based on testimony corroborated by Webster's cell phone records (Joint Ex. 1), I find that after speaking with Clark at the condominium, Webster called Agent Lally at 3:22 p.m. to start the warrant application process.  Webster had trouble finding the right phone number for Lally, and called Assistant Attorney General Sutton at 3:35 p.m., then again at 3:39 p.m. (because the cell phone was disconnected during the first call) to discuss the situation and inform her that he was going to ask Lally to apply for a warrant.  At 3:41 p.m., Webster called and reached Lally and dictated the warrant application to him.  Sutton remembers Lally coming to her office to discuss the warrant application around 4:00 p.m.  Lally then brought the application to the state judge, who denied the warrant around 5:00 p.m.

9

which might have caused confusion.  I find that Webster never told Clark and Gagnon one way or the other about what the judge did on the warrant.

32.     King left the premises at 4:15 p.m., incorrectly believing at that time that the warrant had already been denied.  He had no further involvement.

33.     At some point after King left, Taft asked Gagnon about weapons and syringes.  Gagnon told Taft that there was a rifle on the floor next to the bed and that he had mace and a pocket knife on his person.  At Taft's request, Gagnon placed the mace and pocket knife on the table.  Gagnon showed Taft the rifle, which Taft examined.  Gagnon also told Taft that in the unit were plastic implements that looked like syringes for feeding pet fish.  Webster was in the parking lot using his cell phone, and was not present for any of this conversation.  When Webster later re-entered the unit, Taft told him about the gun and Webster went into the bedroom to examine it.

34.     Around 5:00 p.m., Webster learned by cell phone that the state judge had refused to issue a search warrant.  He was surprised and upset, this being the first time a judge had denied one of his warrant applications.  He discussed the denial by phone with Agent Lally, with his supervisor Agent Pelletier, and with Assistant Attorney General Sutton.

35.     Webster then returned to the unit and told Clark and Gagnon that he was leaving, but that the investigation was not over.  In an effort to put an end to the suspicion over the source of their money (Gagnon had told Webster that

together they had about $50,000 cash in the safe), Gagnon offered to show Webster their tax returns and did so.

36.     I find that Webster and Taft left the unit for the final time around 5:15 p.m.  Webster testified to that effect.  It is confirmed by his pattern of cell phone activity.  <u>See</u> Joint Ex. 1.  It is also confirmed by the Bridgton Police Department complaint card (Def. Ex. 26), which shows Officer Taft clearing the premises (by a radio call to dispatch) at 5:18 p.m.  Taft also testified to that effect, but seemed to have no memory independent of the document.  I realize that my finding on this point is directly contradicted by Clark and Gagnon who both maintain that Webster and Taft remained on the premises until about 7:00 p.m.[10]

---

[10] Clark and Gagnon's approximately contemporaneous computer notes and their three written complaints to state authorities in 2003 all have Webster and Taft there until 7:00 p.m.  The problem with having Webster and Taft remaining there until 7:00 p.m. is explaining what they were doing for the two hours after Webster learned that the warrant was denied (around 5:00 p.m.), as well as Webster's cell phone records reflecting a series of calls between 6:29 and 6:55 p.m. The "search" Clark and Gagnon describe would have taken minutes at most.  (Under Clark's and Gagnon's versions reflected in their federal complaint, ¶¶ 25-28, the search began and ended between 6:45 pm and 7:00 pm.)  Moreover, the alleged "search" makes no sense. First, Webster knew that an Assistant Attorney General and a state judge were aware that his warrant request had been rejected.  On what grounds could he later justify a warrantless search if he did find something?  Second, if for some reason he decided to search, why would he leave out relevant places (a second nightstand; a more thorough inspection of the wardrobe/closet; etc.)?  Clark and Gagnon testified that Webster looked only in the bathroom, the closet, the laundry room and the bedroom; Gagnon claims that Webster searched only one nightstand drawer and only peeked in the closet in the bedroom, and did not look in the other nightstand drawer or in the dresser.  It is unlikely that, if Webster were conducting a warrantless search, he would fail to do a complete search of areas such as nightstand and dresser drawers where drugs, drug paraphernalia, or money could easily be hidden.  Moreover, the warrant application (Joint Ex. 8) stated that the safe that contained the money that Clark received from the bank was in the bedroom.  If Webster had decided to search the bedroom, surely he would have looked more thoroughly in the closet and in other areas in the room to try to find the safe.  Clark's and Gagnon's contemporaneous computer notes (Def. Ex. 3) contain absolutely no reference to any search.  Likewise, Clark and Gagnon say
*(continued on next page)*

37.     Contrary to the testimony of Clark and Gagnon, I find that Webster did not participate in any search of the unit.  Because there is no claim in the Complaint that Webster is liable for actions taken by Taft, I do not need to determine what kind of search Taft undertook or why or when.[11]

---

nothing about it in their three 2003 complaints except a short reference that Webster "looked around."  Def. Exs. 13-15.  In a telephone complaint about Webster to Agent Lally soon after the incident, Gagnon also made no reference to a search.

At trial, Clark and Gagnon shortened the amount of time they claimed the officers were at the condominium.  They testified that the search happened after 5:30 p.m., and that Taft and Webster left together at some point after 6:00 p.m.  They claim to know this because their neighbors usually came home around 5:30 p.m., and Clark and Gagnon testified that around the time the warrantless search occurred they heard their neighbors come home and smelled marijuana coming from the neighbors' condominium (Taft remembers smelling marijuana).  Gagnon also testified that he remembered looking at a microwave oven clock after 6:00 p.m. before Webster and Taft had left.  But Taft testified that he left at 5:18 p.m., based on the time that the dispatch at the police station recorded that he radioed in to say that he was leaving Clark's and Gagnon's condominium.   (Neither side offered evidence about what the Bridgton Police Department dispatcher would do if an officer radioed that he was leaving a location and then was radio-silent for an hour and three-quarters.)  Clark's and Gagnon's lack of consistency on the timing casts doubt on their testimony that the search occurred.  (Their complaint in federal court has Taft putting on his gloves in preparation for a search at 6:45 p.m.; their testimony at trial was that this occurred at 5:15 p.m.)

[11] It is nevertheless troubling that Taft describes a search of sorts.  Taft also testified that Gagnon consented to a complete search, something that Webster denies.  Puzzlingly, Taft then testified that he conducted only a partial search.  (Taft testified that in the bedroom he looked only on the top of the nightstand, and that neither he nor Webster opened any drawers.)  There would be no reason to conduct only a partial search if there were consent.  Perhaps Taft conducted some sort of search on his own while Webster was in the parking lot.  (That is unnecessary for me to decide.)  But I do not find that Webster participated in any such search.  (He did go into the bedroom with Taft to look at the gun that Gagnon had shown to Taft.)  I am also concerned that Webster's report prepared shortly after the incident says that he "waited for several hours in Bridgton until S/A Lally contacted me."  Joint. Ex. 10.  Certainly Webster was in Bridgton for several hours, but, by his trial version of events, he waited well under two hours for Lally to tell him that the judge had denied the warrant.

I will never be satisfied that I know what actually happened in the condominium unit that afternoon and early evening.  But after considering their changing stories, I conclude that Clark and Gagnon have not shown by a preponderance of the evidence that Webster conducted a search after being denied the warrant.

## II.  CONCLUSIONS OF LAW

**A.**     **SECURING THE CONDOMINIUM WHILE WAITING FOR A WARRANT**

This case is much like <u>Illinois v. McArthur</u>, 531 U.S. 326 (2001).  There police, while waiting for a search warrant, told a homeowner that he could not re-enter his home unless a police officer accompanied him.  When he did go inside, police accompanied him and observed what he did.  <u>Id</u>. at 329.  The Supreme Court held that although this was a warrantless seizure of the home, it was nevertheless constitutional.  It involved "a plausible claim of specially pressing or urgent law enforcement need, *i.e.*, 'exigent circumstances,'" and the restraint was "limited in time and scope" and "avoid[ed] significant intrusion into the home itself."  <u>Id</u>. at 331.  The Court "balanc[ed] the privacy-related and law enforcement related concerns to determine if the intrusion was reasonable."  <u>Id</u>.  The Court found that the home seizure was reasonable because the police:  (1) had probable cause to believe that the home contained drugs, *i.e.*, "evidence of a crime and contraband"; (2) had "good reason to fear" that the home occupant would destroy the evidence, unless prevented from doing so, before the warrant was obtained; (3) "made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy" by securing the home rather than searching or arresting     (and that preventing the occupant from entering his home unaccompanied was "a significantly less restrictive restraint"); and (4) "imposed the restraint for a limited period of time, namely, two hours," "no longer than

reasonably necessary for the police, acting with diligence, to obtain the warrant." Id. at 331-32; see also id. at 337.  In upholding the warrantless home seizure, the Court observed that "[w]e have found no case in which this Court has held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time."  Id. at 334.  The Court specifically addressed the issue of police accompanying the occupant into the home: such an entry was permissible because it was for the homeowner's "own convenience." "[T]he reasonableness of the greater restriction (preventing reentry) implies the reasonableness of the lesser (permitting reentry conditioned on observation)." Id. at 335.[12]

I conclude that Webster's actions in securing Clark's and Gagnon's condominium meet all the criteria of Illinois v. McArthur.[13]  Webster had probable cause to believe that the condominium contained contraband or other evidence of a crime.  He could reasonably believe that Clark and Gagnon would destroy any evidence of marijuana trafficking in the condominium if they were allowed to

[12] LaFave notes that this Supreme Court statement "indicates that if the [individual being observed] were actually presented with th[e] option [to await the warrant inside, observed by the police] and elected it, then there would be little chance the police action would be found unreasonable."  3 Wayne R. LaFave, Search and Seizure § 6.5(c) (4th ed. 2004), at 426.

[13] Webster contends that Segura v. United States, 468 U.S. 796 (1984), permitted him to secure the premises from inside.  I do not analyze this case under Segura.  See 3 LaFave, supra, § 6.5(c), at 419 (noting that Segura "does not settle . . . the type of case . . . where the police enter and incident to the entry either keep persons entitled to be in the premises under close scrutiny or else require such persons to leave or not enter those premises").

remain inside unobserved while aware of the law enforcement investigation. Webster did not search the house or arrest the occupants. Instead, the restrictions Webster imposed were of limited duration (two hours, just as in McArthur, and only as long as the warrant process required), and were "tailored reasonably to secure law enforcement needs while protecting privacy interests." McArthur, 531 U.S. at 337. Additionally, Webster reasonably believed that Clark had elected to have the seizure occur inside. (Such a preference by Clark, so that she could sit on the couch rather than stand outside for two hours, is quite understandable. Remember that Clark had suffered second degree burns that morning, been sent to the hospital and had returned home to rest.)

Clark and Gagnon argue that it was unlawful for Webster to remain inside the condominium after Gagnon asked him to leave. But the officers were entitled to be present to keep the premises secure if Clark and Gagnon wanted to remain inside. Webster told Clark outside the condominium that he was securing the unit and could do so from the outside or the inside. Clark elected to go inside. Similarly, Officer King told Gagnon that he needed to be accompanied by

someone at all times if he wanted to enter.[14]  The restrictions were "tailored reasonably" to law enforcement needs according to the <u>McArthur</u> standard.[15]

It was also reasonable for Webster to tell Clark and Gagnon that they would be searched if they left the condominium and then again if they returned, and that their vehicles would be searched if they left the condominium.  Such a search was necessary to make sure that contraband did not leave the condominium.  Since the warrant application included the vehicles, it was reasonable to search any vehicle Clark or Gagnon left in to make sure that evidence was not being removed. A concern for officer safety and for securing the area that was the subject of the search warrant would also justify a search of Clark or Gagnon before either one re-entered the condominium after leaving.

Clark and Gagnon claim that, in response to their request to use the bathroom, Webster told Officer Taft that they could not flush the toilet and could use the bathroom only with the door open.  I have found as fact that Webster was not involved in any limitation on Clark's or Gagnon's use of the bathroom.  Even if Webster did instruct Taft to restrict Clark's and Gagnon's use of the bathroom, such a restriction on use of the bathroom would be reasonable under the

---

[14] According to Clark and Gagnon, Webster also told them that he might seize their money even if he did not find marijuana and that the warrant would permit him to do so.  It was reasonable for Webster to say this because he might have grounds to conclude that the money was illegal proceeds from drug trafficking that he could lawfully seize.

[15] The officers had no obligation to inform Clark and Webster that if they both left the unit there would no longer be any ground for the officers to remain inside.

circumstances.  It was appropriate to prohibit Clark or Gagnon from flushing the toilet because they could have flushed any marijuana that was either on their persons or in the bathroom.[16]  Given the strong possibility that evidence could have been destroyed while Clark or Gagnon were in the bathroom, it would have been reasonable for Webster to place a significant limitation on Clark's and Gagnon's privacy by requiring that they use the bathroom with the door open (and the more limited restriction of prohibiting them from flushing the toilet).  Clark and Gagnon also had the alternative of going outside to a neighbor's or elsewhere to use the bathroom, thereby experiencing only the lesser restriction of a pat-down upon exit and re-entry of the condominium.  Once again, the restrictions (if they even occurred) were reasonably tailored.

**The Specific Question of Exigent Circumstances.**  Webster had "a plausible claim" (McArthur's standard) of exigent circumstances because he "had good reason to fear that, unless restrained," Clark and Gagnon would destroy any drugs, paraphernalia or evidence in the condominium before Webster could get a warrant.  McArthur, 531 U.S. at 331, 332.  Clark and Gagnon knew that the officers were looking for drugs.  Had the officers remained outside and allowed Clark and Gagnon inside while waiting for the warrant, Clark and Gagnon could

---

[16] Clark and Gagnon suggest that, rather than requiring that the door remain open, the officers could have patted down Clark or Gagnon before that person entered the bathroom.  But there could have been contraband in the bathroom that Clark or Gagnon could have swallowed or secreted while in the bathroom with the door shut.

easily and quickly have destroyed any marijuana at the condominium by, for example, flushing it down the toilet.

Clark and Gagnon argue that Webster unlawfully created the exigency by telling Clark that he was at the condominium because the bank informed him that Clark's money smelled strongly of marijuana.  They claim that if Webster had not told Clark why he was there, there would be no reason to fear the destruction of evidence because Clark would not know that he was looking for drugs.  Police officers cannot unnecessarily create exigent circumstances.  See 3 LaFave, supra, § 6.5(b), at 400; see also United States v. Curzi, 867 F.2d 36, 43 n.6 (1st Cir. 1989) ("Circumstances deliberately created by the police themselves cannot justify a warrantless search."); United States v. Rengifo, 858 F.2d 800, 804 (1st Cir. 1988) ("'[E]xigent circumstances' do not excuse the failure to secure a warrant when those circumstances are created by government officials who unreasonably and deliberately delay or avoid obtaining the warrant.").  But here, Webster did not unnecessarily create the exigency.  He needed to tell Clark why he was at the condominium in order to further his investigation.  When he arrived at the condominium, Webster did not believe that he had probable cause to search the condominium.  It was only after Clark informed him that the money she had exchanged was inside the condominium and failed to give him a plausible explanation for the large amount of money she exchanged and its

strong odor of marijuana that he believed he had probable cause to search the unit.

As Webster's lawyer argued in closing, Clark might have been able to give Webster a satisfactory explanation that would have avoided a search of the residence—for example, that she received the currency from selling a car (along with contact information for the buyer).  In short, Webster's questioning of Clark about the money she exchanged at the bank was a legitimate effort to discover more information, not mere creation of an exigency to excuse a warrantless seizure.[17]  See 3 LaFave, supra, § 6.5(b), at 400-03 (distinguishing lawful and logical investigative techniques from situations when the police unnecessarily created exigent circumstances).  It therefore meets the McArthur standards ("plausible claim").

**The Specific Question of Probable Cause.**  I conclude that Webster had probable cause to search Clark's and Gagnon's condominium on August 12,

---

[17] Clark and Gagnon argue that United States v. Curzi requires the exigent circumstance to exist before the officers announce their presence.  In Curzi, the First Circuit held that prior exigent circumstances were needed to justify the police officers' initial decision to reveal their presence because the "agents realized in advance that once they made their presence known, a security search would [become] necessary."  867 F.2d at 43; see also United States v. Torres, 274 F. Supp.2d 146, 157 (D.R.I. 2003) (also cited by the plaintiffs) (relying on Curzi in a factually similar situation where the police knew in advance that a safety sweep would be necessary once they announced themselves).  The situation here is factually distinct from Curzi because Webster did not realize in advance that a sweep would be necessary.  As noted, Clark could have given him an explanation that would have obviated the need to search the condominium.  Alternatively, she could have chosen to remain outside the unit and thereby avoided even a security sweep.

2003, at the time he secured it.[18]  Probable cause to search "exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." Ornelas v. United States, 517 U.S. 690, 695 (1996).  Based on the information known to him before he entered the condominium, Webster reasonably could have believed that contraband or evidence of drug trafficking or proceeds would be found in the condominium.  It was reasonable for him to think that the amount of money Clark exchanged, around $14,000, was inconsistent with a waitress's salary and that the large number of twenty-dollar bills was at odds with the tip explanation provided by Clark when she was questioned.[19]  He could have thought that exchanging rather than depositing the money, the low level of funds in Clark's bank account, and her questioning the reason for a currency transaction report collectively indicated a desire to avoid bank records of her

---

[18] I review independently whether probable cause existed rather than defer to the state judge's finding that the affidavit did not establish probable cause to issue a search warrant.  Clark and Gagnon argue that I should defer to the state judge's ruling on probable cause, but the question here is what Webster reasonably believed when he applied for the warrant and secured the condominium, not whether the warrant application itself was sufficient to establish probable cause.

[19] Clark did have a satisfactory explanation at trial.  Some customers use credit cards to pay their bills including tips.  The restaurant adds up all the credit card tips at the end of the shift and pays the waitress the total in cash, often using tens and twenties.  Moreover, waitresses often exchange their one-dollar bills at the cash register for higher denominations.  Clark also testified that she received tip money in ten- and twenty-dollar denominations from customers at the White Mountain Hotel who purchased package deals or added the tip money to their room bill, that some of the money reflected checks Clark had cashed and that she does not generally like to keep her money at a bank.  At the time, however, Webster did not possess this information and it therefore does not detract from the reasonableness of his conclusion that he had probable cause to search.

transactions.  Moreover, it was reasonable for Webster to think that the money was actually proceeds from marijuana trafficking because of the strong smell of marijuana on the money (for which Clark offered no plausible explanation), the baggies used to transport the money, and the green, leafy substance found in the baggies.  Although Webster's field test on the substance did not test positive for marijuana, given the small size of the sample for testing, it was reasonable for him still to believe that the substance was nevertheless marijuana based on his observations of the material as an experienced drug agent.[20]  Finally, Clark provided a basis for Webster to believe that the proceeds of any marijuana trafficking were within the condominium when she told Webster outside the condominium that she still had the money she had received at the bank, and that it was inside.[21]

## B.   THE PROTECTIVE SWEEP

Clark and Gagnon contend that, once the officers entered the condominium, Webster participated in an unlawful protective sweep of the residence.  I have found that Webster did not participate in a protective sweep of the condominium.  He is not liable for any such sweep that Taft and King

---

[20] He testified that the pieces were about half the size of a pencil eraser and were smaller than any piece of marijuana that he had tested before.  He also testified that on a previous occasion a small amount of a substance did not test positive for cocaine on the field test but turned out to be cocaine nevertheless.

[21] I do not consider Clark's refusal to consent to a search in determining whether Webster had probable cause to search the condominium.  See 4 LaFave, supra, § 8.1, at 6 n.10 ("[U]nder the *(continued on next page)*

21

conducted because the complaint does not state a claim for supervisory liability or even mention any supervisory authority Webster had over Taft and King.  Finally, even if Webster did participate in a protective sweep, the sweep was lawful under Maryland v. Buie, 494 U.S. 325, 331 (1990).

Clark and Gagnon argue that the sweep here was unlawful because it was not incident to an arrest.  But a Buie sweep need not be incident to an arrest: "Although Buie concerns protective sweeps incident to arrest, [the First Circuit] has extended this doctrine . . . recently to include protective sweeps where the existence of exigent circumstances prompts the entry of police."  United States v. Jimenez, ___ F.3d ___, No. 04-1691, 2005 WL 1970292, at *5 (1st Cir. Aug. 17, 2005) (citing United States v. Martins, ___ F.3d ___, 04-1474, 2005 WL 1502939 (1st Cir. June 27, 2005) (holding that officers may conduct a Buie sweep whenever they lawfully enter a residence)).  See also United States v. Taylor, 248 F.3d 506, 513-14 (6th Cir. 2001) (holding that officers may conduct a limited protective sweep of an area they are constitutionally securing while waiting for a search warrant).

In Maryland v. Buie, the Supreme Court held that

> [1] as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be

---

prevailing view . . . refusal [to consent to a search] may not . . . be considered with other information in making a determination of probable cause or reasonable suspicion.").

> immediately launched.  [2] Beyond that, however, we hold that
> there must be articulable facts which, taken together with the
> rational inferences from those facts, would warrant a reasonably
> prudent officer in believing that the area to be swept harbors an
> individual posing a danger to those on the arrest scene.

494 U.S. at 334.  See also 3 LaFave, supra, § 6.4(c) at 381-82 (describing the

holding in Buie as "two-pronged," with one prong requiring reasonable suspicion

for a "'full' protective sweep" and the other prong "involv[ing] an approved routine

practice" of looking in "spaces immediately adjoining the place of arrest").

The officers here lawfully conducted a routine, limited sweep.  Under the

first prong of Buie, they did not need probable cause or reasonable suspicion to

search for individuals in areas immediately adjacent to the living room where

Clark had positioned herself (that is, areas from which an attack could

immediately be launched).  Buie, 494 U.S. at 334.  The living room opened into

the kitchen; the closet, bathroom, bedroom and laundry room were all connected

to the living room by a short hallway.  See Joint Ex. 3 (schematic drawing of the

condominium).   King and Taft testified that they looked in the rooms of the

condominium to check to see if anyone was hiding there who might endanger the

officers.  It was reasonable for the officers to sweep all the rooms because of the

modest size and open layout of the condominium.  Anyone hiding in any of the

rooms in the condominium could have launched a swift attack on the officers in

the living room.

### C.   WARRANTLESS SEARCH

Clark and Gagnon claim that after the state judge denied the warrant, Webster falsely told them that the warrant was signed, then proceeded to conduct a warrantless search of the condominium.  But I have found as fact that Webster did not tell Clark and Gagnon that the warrant was signed and did not conduct a warrantless search of the condominium.  Even if Officer Taft conducted such a search, Webster would not be liable because the complaint does not state a claim for supervisory liability.

### D.   QUALIFIED IMMUNITY

I have already concluded that Webster did not violate Clark's or Gagnon's constitutional rights.   Therefore, it is unnecessary to reach the qualified immunity defense.  But I address the issue to avoid a retrial in the event that I am wrong.

> The doctrine of qualified immunity protects public officials from liability under § 1983 so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  The doctrine thus protects all but the plainly incompetent or those who knowingly violate the law.

Burke v. Town Of Walpole, 405 F.3d 66, 76-77 (1st Cir. 2005) (citations and internal quotation marks omitted).  Webster agrees that if he secured entry by threatening arrest, he is liable and no qualified immunity defense applies; he also agrees that if he performed a search after the warrant was denied, he is liable and no qualified immunity defense applies.   I have found factually that neither of

these two events occurred.  The qualified immunity defense is pertinent, therefore, only to Webster's decision to secure the premises from inside while he waited for the warrant that he expected to issue.

I apply a three-prong test in evaluating Webster's qualified immunity defense, asking:  (1) whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right"; (2) "whether the right was clearly established at the time of the alleged violation such that a reasonable officer would be on notice that his conduct was unlawful"; and (3) "whether a reasonable officer, similarly situated, would understand that the challenged conduct violated the clearly established right at issue."  Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 61 (1st Cir. 2004) (internal quotation marks and alterations omitted).

For this inquiry, I assume that my earlier analysis is incorrect and that Webster's conduct in securing the condominium from the inside and restricting Clark's and Gagnon's entry and exit violated their Fourth Amendment rights and that their right to be free of unreasonable seizures was clearly established at the time of the alleged violation (the first two prongs of the qualified immunity analysis).

Under the third prong of the qualified immunity test, I conclude that a reasonable officer, similarly situated to Webster, would not understand that securing the residence from inside violated Clark's and Gagnon's right to be free

from unreasonable seizures.  It would be reasonable for an officer to think that McArthur, 531 U.S. at 331, authorizes officers to secure a residence from the inside, if the occupant so chooses, while waiting for a warrant.  See 3 LaFave, supra, § 6.5(c), at 426 (approving this interpretation of McArthur).  The existence of probable cause, a factor considered in McArthur, 531 U.S. at 331, may have been arguable in this case (as demonstrated by the state judge's denial of the warrant application).  But even if probable cause to search the condominium did not exist, qualified immunity would attach because probable cause was not clearly lacking when Webster secured the condominium.  See Cox v. Hainey, 391 F.3d 25, 31 (1st Cir. 2004).  Webster's consultations with Assistant Attorney General Sutton obtaining her endorsement of the existence of probable cause support the conclusion that Webster's actions were objectively reasonable.  See id. at 32.

Qualified immunity would also protect Webster even if I conclude that it was his actions that created the exigent circumstance (by alerting Clark of his intent to search the condominium).  It was reasonable for Webster to believe that, rather than unnecessarily creating an exigent circumstance, he was pursuing a lawful and logical investigative technique to try to discover more information before applying for a warrant.

Qualified immunity would also attach if the restrictions on Clark's and Gagnon's movement (telling them that they would be searched if they left or

reentered the condominium) were found to be unreasonable.  Given the need to secure the condominium and any evidence inside and to protect the officers, the unlawfulness of these restrictions would not have been apparent to an objectively reasonable officer in Webster's situation.  Qualified immunity would therefore protect Webster from liability even if his actions in securing the condominium were unconstitutional.

Therefore, I conclude that even if Webster's actions in securing the condominium violated Clark's and Gagnon's clearly established constitutional rights, Webster is entitled to qualified immunity because an objectively reasonable officer would conclude that he could secure the unit while he waited for a search warrant for which he reasonably believed he had probable cause, given the information he had, the approval of the Assistant Attorney General and the decision in McArthur.

### III.  SUMMARY

Ultimately a state judge declined to issue a search warrant for Clark's and Gagnon's condominium.  Indeed, no evidence has been presented that either Sara Clark or Sean Gagnon ever committed any crime.  Understandably they are frustrated and upset about the intrusion into their lives and into their home on August 12, 2003.  Nevertheless, I conclude that MDEA Agent Steven Webster did not violate their Fourth Amendment rights.  Accordingly, the Clerk shall enter judgment in favor of the defendant Steven Webster.  No costs shall be awarded.

SO ORDERED.

DATED THIS 31ST DAY OF AUGUST, 2005

/S/D. BROCK HORNBY

**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**